**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-cv-81343-MIDDLEBROOKS

PIKE ELECTRIC, LLC,

      Plaintiff,

v.

GREAT DIVIDE INSURANCE COMPANY,

      Defendant.

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

THIS CAUSE comes before me on the Parties' respective Motions for Summary Judgment.

(DE 44; DE 46).  The Motions are fully briefed, and I held oral argument on September 9, 2025.

(DE 69).  For the following reasons, I will grant Plaintiff's Motion and deny Defendant's Motion.

### I.      UNDISPUTED FACTS[1]

On August 3, 2018 Christopher Rossi, an employee of Civil Search International, L.L.C.

(hereinafter "CSI") was electrocuted while working on a newly installed electric pole of Florida

Power & Light ("FPL") in Delray Beach, Florida. (DE 43 ¶ 13; DE 55 ¶ 13). On January 7, 2019,

the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") issued

a penalty and citation to CSI for the Rossi accident for its failure to provide Mr. Rossi with

sufficient electrical protective gear (gloves and sleeves) during the incident, determining CSI's

failure "expos[sed] the worker to an electrocution hazard. (DE 43 ¶15; DE 55 ¶ 14; DE 42-2 at 3).

Prior to the Rossi accident, FPL had entered into a "Work Agreement" with Pike Electric

LLC ("Pike"), the Plaintiff in this case, to construct and maintain FPL's network of electric poles

---

[1] The facts here are derived from the Parties' respective Statement of Material Facts (DEs 43, 45, 50, 55, 58), as well as their attached exhibits. The facts provided here are undisputed unless otherwise indicated.

and wires. (DE 43 ¶ 8; DE 55 ¶ 8; DE 42-1). The Work Agreement required that Pike defend, indemnify, and hold harmless FPL from any losses, costs, damages, liabilities, and other claims that Pike or any of its subcontractors caused by their own negligent acts or omissions.  (DE 42-1 at 2).  Shortly after entering into the Work Agreement, Pike entered into a "Subcontract" with CSI to provide Pike with workers to perform the FPL job.  (DE 43 ¶ 15; DE 55 ¶ 15; DE 42-2 at 4). Rossi was one of CSI's employees working for Pike on FPL's power lines when he got electrocuted.

The Subcontract between CSI and Pike required that CSI defend, indemnify and hold harmless Pike, its affiliates, joint venture partners, and customers (such as FPL) "from and against all proceedings, claims damages, liabilities, [and] losses" arising out of the performance of services under the contract provided that "any such damages are caused in whole or in part by any act or omission of [CSI], any contract personnel, any subcontractor, or anyone directly or indirectly employed by any of them[.]" (DE 42-2 at 4; DE 43 ¶ 10; DE 55 ¶ 10).  In other words, if CSI or any of its employees caused any damage which gave rise to liability against Pike or FPL, then CSI would be required to defend and indemnify Pike or FPL.

The Subcontract also required CSI to obtain commercial general liability insurance provided through a combination of primary and excess insurance policies and to name Pike as an additional insured to the commercial policy. (DE 42-2 at 5, 11; DE 45 ¶ 14; DE 50 ¶ 14). To oblige, CSI obtained a primary commercial general liability policy with Zurich American Insurance Company (the "Zurich Policy") with limits of $1 million per occurrence for the policy period of November 25, 2017 through November 25, 2018. (DE 41-1; DE 45 ¶ 1; DE 50 ¶ 1). CSI also obtained an excess general liability policy with Defendant Great Divide (the "Great Divide Policy") which provided a loss event limit of $ 5 million for the same period as the Zurich Policy.

(DE 41-2; DE 45 ¶ 1; DE 50 ¶ 1).  It is undisputed Pike was named as an additional insured to the Zurich Policy, subject to certain conditions.

The Great Divide Policy contained a "follow form coverage provision" where Great Divide agreed it would adopt the same coverage for "ultimate net loss" as provided by the "controlling underlying insurance" (i.e., the Zurich Policy), "except to the extent any terms, definitions, limits of insurance, conditions or exclusions of the [Zurich Policy] are different from any terms, definitions, limits of insurance, conditions or exclusion of this [Great Divide] policy[.]" (DE 41-2 at 5).[2] To the extent Great Divide's policy terms, definitions, limits of insurance, and conditions or exclusions were more restrictive than the Zurich Policy, then Great Divide's terms would control. (*Id.*).

These policies and contractual relationships all gained relevance in August 2018 when Rossi was electrocuted while working for CSI and Pike on FPL's power line. (DE 45 ¶ 16; DE 50 ¶ 16). Anticipating a potential lawsuit arising from the incident, in November 2021, FPL tendered its defense and indemnification to Pike pursuant to the Work Agreement. Pike agreed to FPL's pre-suit tender on December 6, 2021. (DE 42-7).

Pike then approached Zurich Insurance to provide it with coverage pursuant to its additional insured status guaranteed by its Subcontract with CSI. On January 19, 2022, Zurich accepted Pike's request and agreed that Pike was eligible for coverage as an additional insured under the Zurich Policy with CSI. (DE 42-8 at 2).  The Parties to this lawsuit dispute the scope of this acceptance. Plaintiff, Pike Electric, interprets Zurich as "fully" accepting the defense and

---

[2] It is undisputed that "controlling underlying insurance" means the policy or policies that are indicated in the Great Divide Policy's "Schedule of Underlying Insurance" and that the Zurich Policy is included within the schedule. The Great Divide Policy confirms this fact. (DE 1-2 at 4).

indemnity of Pike in the Rossi action pursuant to the CSI Subcontract, while Defendant, Great Divide, argues that Zurich qualified its coverage only to the extent Rossi's injuries were caused by CSI or those working on its behalf, i.e. Rossi himself. (DE 42-8; DE 43 ¶ 19; DE 55 ¶ 19).

On August 1, 2022, Rossi filed suit solely against FPL in the Fifteenth Judicial Circuit for Palm Beach County, Florida, bringing a single count of negligence against the utility provider (hereinafter "the Rossi lawsuit"). (DE 41-10).[3]  On December 19, 2022, FPL demanded CSI defend and indemnify it in the lawsuit pursuant to the Subcontract between CSI and Pike.  (DE 42-6).  CSI refused. So, FPL filed a third-party complaint against CSI within the Rossi lawsuit seeking contractual indemnification pursuant to the Subcontract between CSI and Pike, common law indemnity, and contribution. (DE 41-14 at 12-14).

On September 21, 2023, Zurich changed its mind about providing coverage for FPL. Zurich agreed to accept FPL's tender of defense and indemnification to CSI in exchange for FPL's dismissal of its third-party complaint against CSI.  (DE 42-3 at 3).  Again, the Parties to this lawsuit dispute whether Zurich accepted FPL's tender gratuitously or pursuant to the Subcontract between CSI and Pike.  Either way, FPL dropped CSI from the Rossi lawsuit soon after.

On or around March 27, 2024, Mr. Rossi settled his case in principle. (DE 43 ¶ 31; DE 55 ¶ 31). The signed "Release" form, dated April 11, 2024, shows that Rossi accepted an offer of $1.275 million on April 11, 2024. (DE 42-17). The Release also shows Pike and Zurich paid the settlement amount on behalf of FPL to settle the lawsuit between Rossi and FPL. (*Id.* at 2). In exchange, Rossi agreed to discharge FPL, Pike, CSI, and Zurich from any and all claims that were raised or could have been raised in the lawsuit. (*Id.*). It is undisputed Zurich paid $1 million dollars,

---

[3] Rossi filed an Amended Complaint on July 4, 2023, adding a strict liability count against FPL. (DE 41-11).  Again, he did not name either Pike or CSI as Defendants in the suit.

and that Pike paid the rest of the settlement amount out-of-pocket after Great Divide refused Pike's indemnification demands. (DE 42-19; DE 43 ¶ 33; DE 55 ¶ 33).  As I discuss below, the Parties dispute the amount Pike contributed.

On October 25, 2024, Pike brought the current breach of contract suit against Great Divide for its failure to indemnify Pike, seeking its damages for the excess amount it paid to settle the Rossi lawsuit. (DE 1).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material for the purposes of summary judgment only if it 'might affect the outcome of the suit under the governing law.'" *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." *Ellis v. England*, 432 F.3d 1321, 1325–26 (11th Cir. 2005) (citation omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment. Thus, [the Court] do[es] not determine the truth of the matter, but instead decide[s] only whether there is a genuine issue for trial." *Barnett v. PA Consulting Group, Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (citation omitted).

Under the summary judgment standard, the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. If the non-moving party fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial[,]" summary judgment is warranted. *Id.* at 322. The party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. *Id.* at 325. Moreover, "[t]he court must view all evidence in the light most favorable to the non-movant and must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1557–58 (11th Cir. 1990) (citation omitted).

## III.    DISCUSSION

Before analyzing the Parties' arguments, an understanding of Pike's potential path to coverage under the Great Divide Policy is necessary. First, Pike must show it is an additional insured under the Zurich Policy to qualify for coverage under the Great Divide Policy. And if this condition is met, Pike must show it is not barred by the Zurich Policy's Contractual Liability Exclusion provision. Generally that provision excludes coverage if an additional insured's liability arises from a contract, but it contains an exception for "insured contracts," another defined term in the Zurich Policy." Thus, to circumvent the exclusion, Pike would need to show that it or CSI (the named insured) had a contractual obligation to assume the tort liability of another (CSI) to pay for bodily injury to a third person or organization.  Because I find that Pike was an additional insured under the Zurich Policy and that its Subcontract with CSI did not bar it from coverage pursuant to the Zurich Policy's Contractual Liability Exclusion Provision, Great Divide was obligated to indemnify Pike for its contribution to the Rossi lawsuit settlement.

### A.  Pike's Additional Insured Status Under the Zurich Policy

I first address Pike's status as an additional insured under the Zurich Policy, which is the threshold question governing Great Divide's coverage obligations. This is because Great Divide's policy contains a follow form provision linking it to Zurich's.

But first, I must decide which state's law to apply to answer this question. In their briefing, the Parties cite to both Arizona and Florida law and at the oral argument on their Motions, the Parties primarily cited to Florida law.[4]  A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state. *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007).  Here, this case was brought under diversity jurisdiction and Florida is the forum state.  Under Florida's choice of law rules, the doctrine *of lex loci contractus* applies to insurance contracts. Under that doctrine, the law of the jurisdiction where the contract was executed governs the rights and liabilities of the parties in determining an issue of insurance coverage. *See State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006). Here, as Defendant argues the Zurich and Great Divide policies were executed in Arizona and Pike does not dispute this fact, Florida's choice of law rules provide that Arizona law will apply to interpreting these two policies and the arguments surrounding coverage.

Under Arizona law, interpretation of an insurance contract is a question of law and provisions of insurance policies are to be construed in a manner according to their plain and ordinary meaning. *See Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 183 P.3d 513, 534 (Ariz. 2008).  "When the language employed is unclear and can reasonably be construed in more than one sense, an ambiguity is said to exist and such ambiguity will be construed against the insurer.

---

[4] In their briefing, both Parties appear to assert that the outcome is the same regardless of which state's law applies. (DE 46 at 6).

In determining whether an ambiguity exists in a policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business." *Id.* (cleaned up).

Here, the question of whether Pike is an additional insured under the Great Divide Policy hinges on my analysis of the "AI [Additional Insured] Endorsement" provision contained within the Zurich Policy, which the Parties agree controls the Great Divide Policy.[5]  Pike bears the burden to establish coverage under the insuring clause, and Great Divide bears the burden to establish the applicability of any exclusion. *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 13 P.3d 785, 788 (Ariz. Ct. App. 2000).  For the following reasons, Pike was an additional insured under the Zurich policy.

The AI Endorsement within the Zurich Policy provides:

A. **Section II – Who is an Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury," "property damages" or "personal and advertising injury" caused, in whole or in part, by:
   1. Your acts or omissions; or
   2. The acts or omissions of those acting on your behalf;
   in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

(DE 41-1 at 43).

It is undisputed that the Schedule includes Pike as an additional insured. The "you" and "your" language in the AI Endorsement refers to another provision in the Zurich Policy, which defines "you" and "your" as the "Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (DE 41-1 at 25).  It is undisputed that CSI is a Named Insured under the Zurich Policy and so, the Parties agree that the "you" and

---

[5] The Great Divide Policy defines "insured" to mean "any person or organization qualifying as such under the [Zurich Policy]." (DE 41-2 at 15).

"your" language (in the AI Endorsement at least) refers to CSI. (DE 54 at 13; DE 57 at 4).[6]  Thus,

Pike is an additional insured to the Zurich Policy to the extent that CSI or its employees (i.e. Rossi)

caused the liability that gave rise to the Rossi lawsuit.

With this in mind, Pike points to the OHSA Notice and Penalty (DE 42-4), which fined CSI

for its failure to provide Rossi with appropriate electrical safety equipment as showing CSI was at

least contributorily negligent in causing Mr. Rossi's accident.  Furthermore, Pike cites to a report

prepared by FPL's counsel where counsel summarized Rossi's deposition testimony as admitting

that he would have still been electrocuted, even if the FPL power line had been properly managed.

(DE 42-22 at 3-4). The actual deposition is not provided on the record, just FPL's counsel's report.

Great Divide argues that notwithstanding the preceding, Rossi only sued FPL for its negligence

and strict liability; he never made any demands against either Pike or CSI in the leadup to or during

the Rossi lawsuit for either entity contributing to the cause of his injuries. (DE 54 at 5).

I agree with Pike. The existence of coverage and the determination of Pike's status as an

additional insured should not hinge upon who Rossi's personal injury lawyer chose to name or not

name in the underlying lawsuit.  Instead, the realities of the situation should govern this question.

The OHSA citation shows that CSI may well have been the cause, in whole or in part, of the bodily

injury Rossi sustained in August 2018.  The citation states that CSI's failure to ensure Rossi used

proper safety equipment "expos[ed] the worker to an electrocution hazard."  (DE 42-4 at 3).  Great

Divide does not contest the authenticity of the citation or dispute its conclusion.  It merely argues

because Rossi chose not to sue CSI, Pike is not an additional insured on the Zurich Policy for

purposes of the Rossi v. FPL lawsuit. CSI faced substantial exposure to liability based upon the

---

[6] I need not determine whether "you" and "your" here refers to Pike, so I do not engage in this analysis.

possibility that it caused "in whole or in part" bodily injury to Rossi, which gave rise to liability covered by the Zurich Policy.  So, Pike was an additional insured to the Zurich Policy.

Despite this, Great Divide contends Zurich was not legally obligated to contribute to the Rossi settlement because CSI or Pike were never named in the Rossi lawsuit, thus there was no legal obligation for Zurich to pay, therefore since Zurich should not have paid, and Great Divide should have no obligation either. The Zurich Policy provides it will "pay those sums that the insured [here, CSI or Pike] becomes *legally obligated to pay as damages* because of 'bodily injury' or 'property damage' to which this insurance applies." (DE 41-1 at 25) (emphasis added).  There are two issues with that argument.

First, the weight of the caselaw holds that an excess insurer may not challenge the underlying insurer's payment decision to pay in order to argue that the underlying policy limits were not or should not have been exhausted absent allegations of bad faith or fraud. *See* Allan D. Windt, Insurance Claims and Disputes, § 6:45A (6th ed. 2018) ("[A]t least absent fraud/bad faith, an excess insurer is bound by the fact that the primary insurer has paid, and cannot contest (a) that such payment reduces the primary insurer's applicable aggregate, or (b) that the excess insurer must provide policy benefits when the aggregate in any relevant primary policy has been exhausted."); *see also See AXIS Reinsurance Company v. Northrop Grumman Corporation*, 975 F.3d 840, 846 n.6 (9th Cir. 2020) (compiling caselaw from various states).  Of course, "excess insurers may contract around this general rule by including specific language in their policies reserving a right to challenge prior payments[.]" *Axis*, 975 F.3d at 844.  Here, there is no language within the Great Divide Policy that would permit Great Divide to challenge Zurich's decision to

fully exhaust its policy limits.[7]  Neither has Great Divide made any bad faith arguments. Instead, because the Great Divide Policy states it "will pay on behalf of the insured the ultimate net less in excess of the underlying insurance limit" once the underlying policy "has been exhausted by payment of judgments, settlements, costs or expenses[,]" it is bound to Zurich's decision to pay, even if it was, as Great Divide characterizes, merely a "gratuitous business decision." (DE 41-1 at 25).

Furthermore, the Arizona Court of Appeals has interpreted a commercial general liability insurance policy with similar indemnification language as that of the Zurich Policy that the express requirement "legally obligated to pay" did not mean "strictly liable to pay." *Desert Mountain Properties Ltd. Partnership v. Liberty Mut. Fire Ins. Co.*, 236 P.3d 421, 428 (Ariz. App. Ct. 2010). Instead, the court concluded that a "legal obligation to pay means any obligation enforceable by law, including, for example, an obligation created by statute, contract or the common law. Once created, the obligation exists prior to and even in the absence of a suit to enforce it or a court order compelling performance." *Id.* (cleaned up). Thus, "coverage for sums an insured becomes legally obligated to pay as damages may be triggered even in the absence of a civil lawsuit against the insured or a court order requiring the insured to make payment." *Id.* (cleaned up). Here, by virtue of the negligence exposure, FPL's contractual indemnification, common law indemnity, and contribution claims against CSI in the Rossi action, Zurich had a legal obligation to pay for CSI's role in causing the damages which gave rise to the Rossi action. Under Arizona's broad definition of what may constitute a legal obligation to pay, Zurich had a legal obligation to contribute to the Rossi settlement in light of CSI's (partial or whole) causation of the Rossi action.

---

[7] I discuss the Great Divide Policy's Loss Payable Provision, where Great Divide purportedly must approve of an insured's decision to pay part of an "ultimate net loss" in another section below. *See infra*.

### B. Contractual Liability Exclusion

Having concluded Pike was an additional insured under the Zurich Policy, I turn to the

Parties' arguments surrounding the policy's Contractual Liability Exclusion provision, which

again, the Great Divide follows from.  This provision precludes coverage for contractual liability

incurred by the insured under the two policies unless such liability would exist in the absence of a

contract or was assumed in an "insured contract" as defined under the Zurich Policy.  Here, Great

Divide first "bears the burden to establish the applicability of any [policy] exclusion." *Keggi*, 13

P.3d at 788.  If Great Divide meets this, then the burden shifts to Pike "of proving his claims falls

within an exception to that exclusionary clause." *Hudnell v. Allstate Ins. Co.*, 945 P.2d 363, 365

(Ariz. Ct. App. 1997).  For the following reasons, I agree with Pike that an exception to the

contractual liability exclusion applies and so Great Divide had a contractual duty to contribute to

the Rossi settlement on Pike's behalf.

The Contractual Liability provision states that the Zurich Policy does not apply to bodily

injury or property damage "for which the insured is obligated to pay damages by reason of the

assumption of liability in a [another] contract or agreement." (DE 4-1 at 26). It is undisputed that

the Contractual Liability Exclusion applies here.[8] But the contractual liability provision has two

exceptions:

> This exclusion does not apply to liability for damages:

---

[8] Both of FPL's tender letters to Pike clearly sought defense and indemnification based on the contractual indemnification provisions of the Work Agreement between Pike and FPL and Pike does not argue otherwise. (DE 41-6).  I also note that the *Desert Mountain* case cited above also found that such "an agreement to indemnify or hold another harmless" met the criteria for excluded coverage under an almost identical exclusionary provision to that of the Zurich Policy. *See Desert Mountain*, 236 P.3d at 431-32.  Accordingly, Great Divide has shown the contractual liability provision applies to Pike's demands for Great Divide to honor Pike's contractual obligations with FPL.

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

(*Id.*).

Pike argues both exclusions apply. Because I conclude that Pike has met its burden of establishing that the "insured contract" exception applies, I need not reach the question of whether the first exclusion applies.

In relevant part, the Zurich Policy defines "insured contract" as the "part of any other contract or agreement pertaining to your business…under which you assume the tort liability of another party to pay for 'bodily injury' or 'property damage' to a third person or organization." (DE 41-1 at 37). Pike argues that both the FPL/Pike Work Agreement and the Pike/CSI Subcontract are "insured contracts." (DE 51 at 16-17).  It is undisputed that the Rossi accident occurred after the execution of either contract.

Again, the "you" and "your" provision of the Zurich comes into play here.  The Parties do not dispute that this language refers at least to the named insured, CSI.  The Parties dispute whether this language also applies to additional insureds, i.e. Pike Electric. If "you" only refers to CSI, only the CSI/Pike Subcontract could qualify as an insured contract, and if "you" also refers to Pike, then its Work Agreement with FPL could also qualify.

Because the Parties agree that the "you/your" language within the definition of "insured contract" refers to CSI, I find that the "you/your" dispute is non-dispositive because the CSI/Pike Subcontract is an "insured contract" under the Zurich Policy.  It is undisputed that the Subcontract requires that CSI indemnify Pike and FPL for CSI/its employees' negligence that gives rise to liability against either Pike or FPL. (DE 42-2 at 4).  Great Divide's primary argument was that the

13

Subcontract was never implicated because neither CSI nor Pike were ever named to the Rossi Action and so CSI did not contribute to liability for the Rossi Action.  But, as I discuss above, CSI was liable for its failure to provide Rossi with appropriate safety equipment, and so the Subcontract was implicated. Thus, Zurich had a contractual duty to indemnify Pike, its additional insured for the Rossi settlement. *See supra*.

The second exception to the Contractual Liability Exclusion provision carves out an exception for an "insured contract," which the Parties agree refers to contracts where CSI agreed to "assume the tort liability of another party [Pike or FPL] to pay for 'bodily injury' or 'property damage' to a third person [Rossi] or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement." (DE 41-1 at 37).  It is undisputed that Rossi sued FPL based on the events in August 2018 that did not arise out of a contract or agreement, but rather on FPL's negligence and strict liability.

Thus, the Zurich Policy expressly created coverage to provide a limited range of contractual liability coverage, including in this case, for the CSI Subcontract indemnity agreement. *See Musgrove v. Southland Corp.*, 898 F.2d 1041, 1044 (5th Cir. 1990) (contractual liability coverage provisions are specifically designed to provide coverage for the liability of another party through an indemnity agreement). Because CSI was at risk for liability for its failure to provide Rossi with appropriate safety equipment, Zurich had a contractual duty to indemnify Pike and FPL for the Rossi settlement. *See supra*. Thus, the CSI Subcontract was an "insured contract" subject to the exception to the Contractual Liability Exclusion and Great Divide was obligated to provide coverage.

### C. Great Divide Loss Provision

Finally, Great Divide argues that its policy contains a "loss payable provision" where liability under its policy will not apply "unless and until the 'insured' or 'insured's' 'underlying insurer' has become obligated to pay the full and complete amount of the applicable 'underlying insurance limit.' Such obligation by the insured to pay part of the 'ultimate net loss' shall have been previously determined by a final settlement or judgment after an actual trial or written agreement between the 'insured', claimant and us." (DE 41-2 at 14; DE 46).  Great Divide makes this argument because this provision is more restrictive than that of the Zurich Policy, so Great Divide's coverage decision would not be controlled by the follow form to the Zurich Policy here.

There are several issues with this argument. First, as discussed above, Zurich was legally obligated to contribute to the Rossi settlement by virtue of CSI's exposure for the Rossi accident and the Subcontract required CSI to defend/indemnify Pike and FPL for damages it caused. *See supra*. Secondly, the loss payable provision states that "[s]uch obligation by the 'insured' to pay part of the 'ultimate net loss' shall have been previously determined by a final settlement or judgment after an actual trial or written agreement between the 'insured', claimant, and us." (DE 41-2 at 14) (emphasis added). The emphasized language shows that this loss provision does not apply to the scenario here since the entire Zurich Policy was exhausted, not a "part" of it.  Finally, an excess insurer may not challenge the underlying insurer's payment decision to pay in order to argue that the underlying policy limits were not or should not have been exhausted absent allegations of bad faith or fraud. *See* Allan D. Windt, Insurance Claims and Disputes, § 6:45A (6th ed. 2018).

In conclusion, because the Great Divide Policy follows form from the Zurich Policy and because the only other provision that is more limiting than the Zurich Policy is the loss payable

provision (which fails to prevent coverage here), Great Divide breached the policy by failing to contribute to the Rossi settlement.

## IV.    DAMAGES

There is a remaining issue that will require supplemental briefing from the Parties.  The Rossi Settlement Release indicates that Rossi agreed to release FPL, Pike, Zurich, and CSI for $1,275,000.00.  (DE 42-17 at 2).  In this lawsuit, however, Pike and Great Divide disagree on how much Pike contributed to the settlement. Pike contends that the amount was $342,798 but does not support this allegation with an accurate citation to the record, which Defendant rightfully points out. (DE 43 ¶ 31; DE 55 ¶ 31).  Accordingly, I will require the Parties to jointly confer and submit a Notice submitting they agree to the amount paid or indicate that they will need an evidentiary hearing on damages in this case.

## V.    CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1) Plaintiff Pike Electric LLC's Motion for Summary Judgment (DE 44) is **GRANTED.**

2) Defendant Great Divide Insurance Company's Motion for Summary Judgment (DE 46) is **DENIED.**

3) Plaintiff's Motion to Strike (DE 59) is **DENIED.**

4) The Parties shall confer and file a Joint Status Report on Damages, indicating whether they agree on the amount Pike paid to settle the Rossi action.  The report is due **by October 3, 2025.** If the Parties cannot agree, I will set the matter for an evidentiary hearing at a date and time convenient to the court.

5) Final Judgment shall be separately entered in favor of Plaintiff Pike Electric, LLC

against Defendant Great Divide Insurance Company, after a determination of damages

is made.

**SIGNED** in Chambers in West Palm Beach, Florida, this 23rd day of September 2025.


Donald M. Middlebrooks
United States District Judge


cc:      Counsel of Record